**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America | No. CR-12-01196-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Charles Leo Thomas-1 | |
| Defendant. | |

On October 10, 2012, the Court held a hearing to determine whether certain statements made by Defendant Charles Thomas were obtained from him in violation of *Miranda v. Arizona* and the Fifth Amendment to the U.S. Constitution and should consequently be suppressed. After considering the evidence presented and the submissions of the parties, the Court grants in part and denies in part the Defendant's motion.

## FACTUAL BACKGROUND

On April 18, 2012, Marysa Lewis contacted the Gila River Police Department to report a dead body she saw in a car parked outside her house. Officers were dispatched to the scene at around 8:30 PM, and arrived about 8:38 PM. After canvassing the area, they eventually discovered a body, identified later as the victim Kevin Davis. One of the officers, Officer Vargas, began to designate a crime scene by taping off the area where the body was found and the nearby residence. Officer Welch joined Officer Vargas as Officer Vargas was securing the scene. Officer Vargas was called away from the scene to

take a DUI call, but subsequently returned.

At some point that evening, the Defendant, who was not known to either officer and appeared to be under the influence of alcohol, was seen walking down the middle of the road toward the area. Once he was near, Officer Vargas asked the Defendant who he was and what he was doing there. The Defendant identified himself as Charles Thomas and stated that he lived at the same house as Lewis. Officer Vargas asked the Defendant where he had been and he replied that he had been drinking heavily and was still quite drunk. The Defendant sought to discover the purpose behind the heavy police presence, but Officer Vargas told him only that a crime was being investigated. The Defendant soon became angry and shouted at the officers for their failure to specify what was happening at his residence. In the course of the encounter, the Defendant also stated that Davis (the victim) owned the car in front of the house and that his nickname was "Whitehair." Officer Vargas continued to question the Defendant about his previous interactions with the victim and others that day. The Defendant said they were all drinking liquor, but he could not recall much else because he had passed out. At this point, Officer Vargas ceased questioning the Defendant. The Defendant, however, remained at the scene and became increasingly angry and vocal. Officer Vargas and Officer Welch decided to place the Defendant in handcuffs and sit him on the ground. At this point, approximately 25 minutes had elapsed since Officer Vargas first saw the Defendant.

The Defendant asserts that Officer Vargas and/or Officer Welch were aware at this time that another officer had interviewed a neighbor, Harlan Blackwater, who told the interviewing officer that the victim had been fighting with three men that evening, including the Defendant. The Defendant argues he was thus detained as a suspect as soon as he identified himself to Officer Vargas and that this was the reason he was placed in handcuffs. As proof of his contention that the officers were aware that Blackwater's statements identified the Defendant as a participant in the fight with the victim, the

Defendant relies on a printout from the dispatcher that identifies three people—including the Defendant—as subjects at the scene. That printout had a timestamp of 21:22, or 9:22 PM. The Defendant contends that the officers must have known he was a suspect, based on the 9:22 PM radio call, once he identified himself to them.

Both officers testified at the hearing that they did not hear any radio dispatch concerning the Defendant and had no reason to consider the Defendant a suspect during their encounter. Officer Vargas testified that he left the scene prior to his encounter with the Defendant to take a DUI call, and as soon as he returned he was involved in marking the crime scene and putting up tape to protect the scene. Officer Welch testified that he was asked to keep another subject under observation in his patrol vehicle. Officer Welch, however, testified that he did not know and was not told the identity of that person, who he later learned to be Delbert Thomas, another of the persons who Blackwater had described as fighting with the victim that afternoon. The Court determines that at the time they had their initial encounter with the Defendant, until after they placed him in handcuffs to protect the scene and secure their safety, Officers Vargas and Welch were not aware of the nature of the statements made by Harlan Blackwater to another officer.

Both officers testified that the sole reason they placed the Defendant in handcuffs was that he was drunk, angry, and increasingly loud, and they found it necessary to secure him until he could calm down to preserve their safety and guarantee the integrity of the scene. While he was seated on the ground, and not in response to any questions, the Defendant blurted "this is bullshit, man. Whitehair was my friend." Officer Vargas repeated the statement and asked the Defendant why "Whitehair" was not currently his friend. The Defendant replied "I mean he is my friend." Officer Vargas left the Defendant under the care of Officer Welch while Officer Vargas went to investigate other aspects of the crime. Officer Welch stayed with the Defendant for some time until he determined that the Defendant had calmed down, at which time Officer Welch removed the Defendant's handcuffs. The Defendant was later detained as a suspect.

The Defendant claims the officers knew he had been identified as a suspect based on Blackwater's statements, and that all statements the Defendant made after identifying himself should consequently be suppressed because he was subjected to custodial interrogation without being Mirandized.

**DISCUSSION**

The warnings required by *Miranda v. Arizona* must be given only when an individual is subjected to custodial interrogation. 384 U.S. 436, 444 (1966). "Whether a person is in 'custody or otherwise deprived of his freedom of action in any significant way,' is answered by reviewing the totality of facts involved at the time of the alleged restraint." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981) (quoting *Miranda*, 384 U.S. at 444). A defendant must be both in custody and subject to interrogation for the *Miranda* warnings to become necessary. *Id.*

The touchstone for the existence of *Miranda* custody is whether the circumstances appear similar to a formal arrest. *See United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) ("To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'") (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). As a shorthand, courts often look at a situation and ask whether "a reasonable person would have believed he could freely walk away from the interrogators", *Kim*, 292 F.3d at 974, or whether "[defendant's] freedom to depart was restricted in any way", *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

In *Booth*, the Ninth Circuit laid out a non-exhaustive list of five factors that are often relevant to determine whether a suspect is in *Miranda* custody: "[1] the language used by the officer to summon the individual, [2] the extent to which he or she is confronted with evidence of guilt, [3] the physical surroundings of the interrogation, [4] the duration of the detention and [5] the degree of pressure applied to detain the

individual." *Booth*, 669 F.2d at 1235. Notably, the *Booth* Court stated that "[h]andcuffing a suspect does not *necessarily* dictate a finding of custody. Strong but reasonable measures to insure the safety of the officers or the public can be taken without *necessarily* compelling a finding that the suspect was in custody. The officers may take reasonable steps to maintain the status quo." *Id.* at 1236 (internal citations omitted) (emphases added).

Up until the moment the officers handcuffed the Defendant, there are no sufficient indicators that he was in custody for purposes of *Miranda*. He initiated the encounter with the officers, no evidence of guilt was presented to him, the conversation—which lasted less than a half hour—took place outside of the Defendant's residence, and there is no evidence the officers were applying pressure to him. He was completely free to terminate the encounter by walking away. None of the first four *Booth* factors apply to the situation. Consequently, there is no constitutional basis to exclude anything the Defendant said until the moment he was handcuffed.

Furthermore, even though he was handcuffed, the Defendant volunteered the initial statement that Davis "was" his friend without being subject to questioning at the time. "Voluntary statements are not considered the product of interrogation." *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006). There is no basis to exclude that statement under *Miranda*.

As to the Defendant's remaining statement in response to Officer Vargas's question, the Court applies the test for custodial interrogation.

After the Defendant made his past-tense statement with respect to Whitehair, Officer Vargas asked him what he meant by the remark. No explosive or accusatory language was used, and the officers at no time indicated that the Defendant was a suspect. It is not clear how long the Defendant was detained with handcuffs, but the statements were made shortly after he sat on the ground. Nevertheless, the fact remains that the Defendant was handcuffed, and remained handcuffed for some time. Officers Vargas and

Welch placed the Defendant in handcuffs because he was drunk and out of control. While *Booth* does state that handcuffs do not automatically create a custodial situation, 669 F.2d at 1236, both officers testified that the Defendant was in their custody and was not free to depart. He was handcuffed and kept constantly under the watchful eye of at least one officer. In the end, the custody inquiry boils down to a determination of whether "a reasonable person would have believed he could freely walk away from the interrogators." *Kim*, 292 F.3d at 974. A reasonable person in the Defendant's circumstances would not have believed that he could stand up, separate himself from the officers, and walk away in handcuffs. The Defendant was in custody.

"Once law enforcement officers take [a person] into custody, the officers may not interrogate the [person] without first exercising certain procedural safeguards," namely providing *Miranda* warnings. *Washington*, 462 F.3d at 1132. The question becomes whether Officer Vargas's questioning amounted to *Miranda*-level interrogation. The classic definition of interrogation is found in *Rhode Island v. Innis*: "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 301 (1980); s*ee also United States v. Moreno-Flores*, 33 F.3d 1164, 1168-69 (9th Cir. 1994). Officer Vargas engaged in express questioning of the Defendant. It appears that Officer Vargas asked only one question, which elicited the response from the Defendant: "I mean he is my friend." But that question occurred because Officer Vargas picked up on the Defendant's use of the past tense in describing his relationship with the victim and sought elaboration, presumably to gather evidence about the crime. In other words, Officer Vargas thought asking the question was "reasonably likely to elicit an incriminating response" from the Defendant. *Innis*, 446 U.S. at 303; *see Anderson v. Terhune*, 516 F.3d 781, 789 (9th Cir. 2008) (en banc). Officer Vargas was engaged in custodial interrogation and issuance of the

*Miranda* warnings was necessary. That did not occur, which means the Defendant's response must be excluded.

Everything the Defendant said until he was handcuffed occurred while not in custody and does not raise any constitutional issue. The Defendant spontaneously made the statement "this is bullshit, man. Whitehair was my friend" without prompting from police and introduction of the statement likewise does not offend the Constitution. Defendant's subsequent statement "I mean, Whitehair is my friend," however, occurred in response to Officer Vargas's questioning while the Defendant was in custody and triggers the need for *Miranda* warnings. None were given and that statement must consequently be excluded.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress is **granted in part and denied in part.**

Dated this 15th day of October, 2012

_A. Murray Snow_____
/G. Murray Snow
United States District Judge